# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| **TERRI R. ESKEW,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:14-cv-00257-SLC** |
| | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY,** *sued as Carolyn W. Colvin,* | ) | |
| *Acting Commissioner of S.S.A.,* | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Terri R. Eskew appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying her application under the Social

Security Act (the "Act") for Disability Insurance Benefits ("DIB").[1] (*See* DE 1). For the

following reasons, the Commissioner's decision will be REVERSED, and the case will be

REMANDED to the Commissioner for further proceedings in accordance with this Opinion and

Order.

## I. PROCEDURAL HISTORY

Eskew applied for DIB in July 2011, alleging disability as of May 15, 2009. (DE 10

Administrative Record ("AR") 108). Eskew later amended her alleged onset date to May 14,

2011. (AR 145). The Commissioner denied her application initially and upon reconsideration.

(AR 62, 68). Eskew requested a hearing before an Administrative Law Judge (AR 71), and

Administrative Law Judge L. Raquel Bailey Smith ("the ALJ") held a hearing on February 27,

---

[1] All parties have consented to the Magistrate Judge. (DE 13); *see* 28 U.S.C. § 636(c).

2013, at which Eskew was represented by counsel (AR 31). On April 5, 2013, the ALJ issued an unfavorable decision, finding that Eskew was not disabled because she was capable of making a successful adjustment to other work that existed in significant numbers in the national economy. (AR 25). Eskew requested the Appeals Council review the ALJ's decision (AR 7), and the Appeals Council denied Eskew's request, making the ALJ's decision the final decision of the Commissioner (AR 2-4).

Eskew filed a complaint with this Court on August 22, 2014, seeking relief from the Commissioner's final decision. (DE 1). In this appeal, Eskew alleges that the ALJ erred by: (1) failing to find that Eskew's spinal impairment met or equaled a listing at step three of the sequential evaluation process; (2) according little weight to the opinion of Dr. Gregory Hoffman; (3) failing to address Eskew's functional limitations prior to her 2012 surgery; (4) omitting unrejected limitations from the hypothetical question and the residual functional capacity ("RFC"); (5) rejecting the treating therapist's opinion and rendering an unsupported mental RFC finding; and (6) finding Eskew's allegations to be not credible. (DE 18 at 1).

## II. FACTUAL BACKGROUND[2]

### A. Background

On her amended alleged onset date, Eskew was 45 years old and had a ninth grade education. (AR 146, 151). Her employment history included briefly working as a breakfast server before working as a cook for nine years. (AR 53, 152, 210). Eskew last worked on May 14, 2011. (AR 50).

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 888-page administrative record necessary to the decision.

## B. Eskew's Testimony at the Hearing

At the hearing, Eskew, who was five feet, seven and one-half inches tall and weighed 220 pounds, testified that she lives alone in a trailer. (AR 35). Eskew described her typical day as consisting of getting up, having some coffee, checking to see if she has any appointments, doing dishes, straightening up the house, doing laundry, watching television, and doing errands if she has any. (AR 36). Eskew stated that she does not do much for fun, as she is unemployed and has no income, although sometimes her friends come over to watch movies or play card games. (AR 36). Eskew drives sometimes, when she is not having too much pain in her right leg or in her hands and wrists. (AR 36). Eskew explained that the Township pays her rent, and she was making some extra money by watching a two-year-old child, but she is no longer doing so because the child's family moved away. (AR 36-37).

Eskew stated that she cannot work because she experiences a lot of pain when she stands, sits, or walks for too long or tries to lift anything heavy. (AR 37). Eskew reported that she could stand for a maximum of 15 minutes before needing to sit down; could sit for a maximum of 30 minutes before needing to get up and move; could not lift even 25 pounds; and could not grasp things well with her hands. (AR 37-38). Eskew could lift a gallon of milk, but she could not carry it for more than 50 feet. (AR 46). Eskew explained that she needed to change positions throughout the day, by getting up and walking to stretch her legs, or by sitting in her recliner and elevating her legs up above her heart to help with the swelling in her legs. (AR 45-46). Eskew estimated that she spends two to four hours out of an eight-hour period reclining and elevating her legs. (AR 46).

Eskew discussed her back surgeries, which took place in October 1992, May 1993, and February 2012. (AR 38-39). During her surgery in 1992, Eskew's doctors took out a herniated disc but left a bulging disc in her back. (AR 39). That bulging disc later "exploded during therapy," so in 1993, she again had surgery to remove the bulging disc along with scar tissue that had wrapped around her sciatic nerve. (AR 39). Her surgery in 2012 was for another disc which "blew out of [her] spine, landed on [her] sciatic nerve that ran down [her] leg which caused severe pain." (AR 38). The 2012 surgery involved a discectomy and a fusion of her vertebrae. (AR 39).

Eskew had worked as a housewife in the 1990s for eight years, but then she started back to work in the early 2000s and worked consistently since then until her amended onset date. (AR 39). Eskew did have back pain while she was working, but she was able to function through it and work full-time. (AR 39-40). While Eskew was working two jobs during 2009, she fell out a door while she was carrying food, and she landed on both of her knees, which caused the pain in her knees to start, and which ended up requiring the 2012 surgery. (AR 40). Since Eskew had the 2012 surgery, the pain in her leg is not as sharp, so she feels better, but her back pain is still bad. (AR 40). She still has pain in her lower back, around her hips, and in the middle of her back. (AR 40). She gets "excruciating pain" in the middle of her back when she stands or sits for too long, and then it "gathers" up to her neck. (AR 40). Eskew also still has pain in both of her legs, which she described as "pinching, sharp pains." (AR 41). Eskew has knee pain as well, but her doctor told her that her knees are fine and the pain is coming from her hips instead. (AR 41). Eskew was receiving physical therapy for her knee at the time of the hearing. (AR 50-51).

Eskew takes naproxen, neurontin (a nerve stimulator), flexeril, and vicodin to manage her pain, but she finds that the medications only help on some days. (AR 41). On a daily basis when she is taking her medication, Eskew rated her pain as being a seven out of 10, and she rated her pain when her medication is wearing off as an eight or a nine out of 10. (AR 41-42).

Eskew also has problems with carpal tunnel in her wrists. (AR 42). Her carpal tunnel syndrome was originally diagnosed in the 1980s or 1990s, but it was not bad until more recently. (AR 42). Eskew stated that the last three weeks before the hearing were the worst she has ever had for her carpal tunnel. (AR 42). Eskew received an EMG and injections in her wrists a week before the hearing. (AR 42-43). Eskew did not see any improvement in her wrists after the injections. (AR 43). She has been having problems grasping and holding onto things, such as when she almost dropped a pan of spaghetti sauce and when she has been dropping little things, such as silverware. (AR 44). She also has trouble using buttons and zippers to fasten her clothing. (AR 44).

Eskew has trouble with doing household chores and also has difficulty going to the grocery store due to the pain she has in her back and the numbness in her feet. (AR 46-47). Eskew stated that she sometimes has to use the motorized carts at the store to do her shopping because her foot goes numb the more she walks. (AR 47).

Eskew also suffers from sleep apnea, although a CPAP machine has been helping her to sleep and breathe better. (AR 47). She believes her sleep apnea problem is related to her anxiety. (AR 47-48). Eskew also believes that her diagnoses for depression and post traumatic stress disorder have affected her ability to work "somewhat," in that she is "really emotional."

(AR 48). Eskew stated that "to be honest, [she] couldn't tell you" whether she could handle taking instruction from a boss or a supervisor. (AR 48-49). She has been seeing a psychiatrist and a counselor for mental health treatment, for her suicidal thoughts and alcohol abuse. (AR 49, 52).

Eskew smokes a half pack to a whole pack of cigarettes per day. (AR 51). She drinks alcohol once or twice per week. (AR 51). She does not take any drugs other than over-the-counter medications or those prescribed to her. (AR 51-52).

### C. Vocational Expert's Testimony at the Hearing

A vocational expert, Dale Thomas ("the VE"), also testified at the hearing. (AR 52-58). The VE, after hearing the ALJ speak to Eskew about her work history, described Eskew's past work as being that of a short order cook, which is a light job, semi-skilled. (AR 53-54). The ALJ and Eskew's attorney then posed hypothetical questions to the VE. (AR 54-57).

### D. Summary of the Relevant Medical Evidence

Eskew had her first back surgery on her lumbar spine in 1992, when she underwent a simple discectomy. (AR 384). In 1993, Eskew had to have a second back surgery, a revision decompression. (AR 384). Eskew continued to seek treatment for residual pain and numbness of her legs and arms over the years. (AR 250-51, 274, 280, 289, 291, 313, 316, 344-45, 350). Eskew underwent a nerve conduction study on March 11, 2009, and the results showed that she had severe bilateral carpal tunnel syndrome, moderate right cubital tunnel syndrome, and peripheral neuropathy. (AR 269).

Eskew had an X-ray of her spine taken on July 30, 2009, which revealed moderate

osteoarthritis from L3 to S1; mild degenerative anterolisthesis of L4 on L5; mild retrolisthesis of L5 on S1; a very slight anterolisthesis of C4 on C5, probably degenerative; and degenerative disc disease at C5-6 and C6-7. (AR 225). Dr. Steven Ko reviewed these X-ray results and stated that Eskew had "osteoarthritic changes and lumbar spine disc and osteoarthropathy with most likely spinal stenosis due to prior disc problems as well as spondylolisthesis," with "spinal stenosis symptoms that are classic in nature with the radicular symptoms down to the right leg." (AR 228). Dr. Ko found that Eskew would "probably most benefit with either surgical intervention and/or nonsurgical physical therapy." (AR 228).

Eskew reported to the emergency room on January 20, 2011, for chronic back pain that had worsened over the past month, which she reported was radiating into her buttocks and down to her legs, and which worsened with movement. (AR 339). Eskew reported that she was uninsured and had been unable to obtain treatment for financial reasons. (AR 339). Eskew stated that she had thoughts of suicide because she had been in so much pain, and she felt hopeless because she had been unable to get help. (AR 339). Eskew was prescribed Toradol, Dilaudid, and Zofran for her pain, and then she was referred to Parkview Behavioral Health because of her suicidal thoughts. (AR 340, 675-76).

Eskew underwent an MRI of her lumbar spine on March 31, 2011, which revealed a large disc extrusion at L5-S1 with severe spinal stenosis; moderately severe spinal stenosis at L4-L5, with associated right L5 lateral recess stenosis due to ligamentum flavum thickening with a prominent synovial cyst, in addition to a diffuse annular bulge with a broad disc protrusion; significant facet arthropathy at L4-L5 bilaterally, with facet subluxation causing grade 1

7

spondylolisthesis at L4-L5; and evidence of prior surgery at L4-L5 and L5-S1 with a moderate degree of epidural enhancing scar tissue.  (AR 335, 395-96).

Eskew presented to Dr. Gregory A. Hoffman on April 15, 2011, who evaluated her 18-month history of bilateral L5 radiculopathy with paresthesias and numbness, which had spontaneously gotten worse over the last nine months without a specific incident.  (AR 384). Eskew complained of chronic and progressive lower back pain, with numbness, weakness, and pain in her lower extremities.  (AR 384).  After examining Eskew, Dr. Hoffman found that she was nontender to palpation of her lumbar paraspinal muscles and bilateral greater trochanters; had full range of motion in her hips for internal/external rotation, flexion and extension bilaterally; had a positive straight leg raise test for her bilateral lower extremities, worse on the right; had intact muscle strength testing at 5/5 for her hip flexors, quads, hip ab/adductors, tibialis anterior, and flexor hallucis longus; had 2+ dorsalis pedis and posterior tibial pulses, equal in the lower extremities; had normal capillary refill less than two seconds bilaterally; was normoreflexive at 2+ for the L4, patella, and S1; had bilateral Achilles reflexes, downgoing Babinskis, and no ankle clonus bilaterally; had weakness on the right extensor hallucis longus 4/5, but normal on the left; and had decreased light touch sensation in the L5 dermatome bilaterally.  (AR 384-85, 640-41).  Dr. Hoffman diagnosed Eskew with lumbar degenerative disc disease, pain, radiculitis, spondylosis, stenosis, and spondylolisthesis/retrolisthesis, and he recommended surgery.  (AR 641).  Dr. Hoffman informed Eskew that the surgery would not improve her chronic left leg symptoms or weakness.  (AR 641).

Dr. H.M. Bacchus, Jr., evaluated Eskew on September 15, 2011, at the request of the

agency. (AR 410-12). Upon examination, Dr. Bacchus noted that Eskew had tenderness throughout the spine, especially her lower lumbosacral region, as well as tenderness in both hips and in her trapezial muscles, with mild spasm. (AR 411). Dr. Bacchus found that Eskew had an antalgic gait; was favoring her right lower extremity, especially her hip and knee; walked without an assistive device, but was barely able to walk on her heels, toes, or tandem walk; was unable to hop secondary to pain; could squat 1/3 of the way down and was slow to rise; had deficits in range of motion for her neck, lower back, left wrist, knees and hips; had 4/5 muscle strength and tone in all of her extremities and 4/5 grip strength in both hands; had slow fine and gross dexterity; and had dullness to sensation in her right lateral elbow, both buttocks and her lateral right lower extremity. (AR 411). Dr. Bacchus diagnosed Eskew with osteoarthritis; history of carpal tunnel syndrome with a positive Tinel sign on the left; a history of degenerative disc disease with spinal cord stenosis of the lumbosacral spine, status post lumbar surgery in the 1990s; chronic lower back pain with bilateral lower extremity pain and paresthesias; right upper extremity ulnar nerve symptoms; gastroesophageal reflux disease; exertional shortness of breath with chronic bronchitis per history; hypertension; depression and anxiety; tobacco abuse; and a history of bladder problems, possibly neurogenic bladder. (AR 412). Dr. Bacchus noted that Eskew's chronic lower back pain with lower extremity radiculopathy had been confirmed via previous MRI imaging, and he opined that she would have "difficulty with repetitive bending, twisting, turning, lifting, climbing and walking on uneven ground." (AR 412). He stated that Eskew should avoid working in unprotected heights; should avoid extreme temperatures or excessive dust, chemicals, or fumes; and noted that her fine and gross dexterity may fatigue with

repetition.  (AR 412).

Eskew presented to Dr. Piyush Kumar on December 27, 2011, for a disability evaluation. (AR 455).  Dr. Kumar noted that Eskew was awaiting back surgery; had undergone an MRI at Parkview; had chronic lower back pain, radiating to her right lower extremities; had a history of incontinence but not current; had controlled pain if no activity or movement; had some chronic numbness in her right lower extremities, but no weakness in any extremity.  (AR 455).  Dr. Kumar opined that Eskew was restricted from bending and was not to lift more than 10 pounds. (AR 455).

On February 16, 2012, Dr. Hoffman operated on Eskew's back, making it her third back surgery.  (AR 632).  Dr. Hoffman performed a revision of the decompression of the L4, L5, and S1 nerve roots; a discectomy at L5-S1; and a fusion at L4 through S1.  (AR 632).  Dr. Hoffman's surgical notes indicated "a huge disk herniation at L5-S1 with almost complete occlusion of the cauda quinine and the canal," "severe stenosis from facette arthropathy to L4-5," a "very obvious" "huge fragment of disk compressing the dural sac at the L5-S1 level," and "nerve roots at L5 and S1 [that] were very thinned out from this chronic compression."  (AR 634-35). Eskew's diagnosis at discharge was failed low back syndrome, status post lumbar decompression; huge central disk herniation at L5-S1 with partial cauda equina syndrome; spinal stenosis, recurrent at L4, L5, and S1 nerve roots; degenerative spondylolisthesis at the L4-L5 and L5-S1 levels; and obesity.  (AR 632).

Dr. Hoffman saw Eskew for follow-up visits after her surgery.  (AR 574-76, 583-84, 609, 618-42).  Dr. Hoffman saw Eskew on March 28, 2012, and noted that she was restricted from

running, jumping, axial loading activities, bending, and twisting; and further noted that she was only permitted to walk. (AR 609, 628). On April 24, 2012, Dr. Hoffman noted that Eskew continued to have the same results from a year prior, namely that she had positive straight leg raise testing bilaterally, worse on the right, with the same weakness of the extensor hallucis longus muscle on the right and decreased light touch sensation in the L5 dermatome bilaterally. (AR 576).

Dr. Hoffman completed an RFC questionnaire on April 4, 2012, in which he noted that he had seen Eskew for office visits, performed operative surgical intervention on Eskew, and then saw Eskew for postoperative visits related to her lumbar spine deformity. (AR 546). Dr. Hoffman diagnosed Eskew with spondylolisthesis at the L4-5 and L5-S1 with huge recurrent disc herniation with neurologic deficit and partial cauda equina syndrome. (AR 546). He rated her prognosis as fair, and he identified her symptoms as including chronic back pain, partial urinary incontinence, lower extremity weakness, and lower extremity numbness. (AR 546). Dr. Hoffman opined that Eskew's symptoms were severe enough that they often interfered with her attention and concentration, particularly as the side effects of her medications include dizziness, drowsiness, gastrointestinal upset, and irritability. (AR 546). Dr. Hoffman estimated that Eskew would need to rest for 15-minute breaks probably three to four times a day. (AR 546). As to her functional limitations, Dr. Hoffman opined that Eskew could walk just one city block before having increased back and lower extremity pain; that she could sit for 30 minutes and stand/walk for 20 minutes; and that she can sit for four hours and stand/walk for two hours in an eight-hour period. (AR 546). Dr. Hoffman stated that Eskew would need a job which permits sitting,

standing, and walking intermittently, and that she would need to take unscheduled breaks once or twice a day during an eight-hour day. (AR 546). Dr. Hoffman expressed that these limitations described Eskew's current capabilities at the time he completed the questionnaire, but he was not sure how she would be a year later. (AR 546). He also noted that she could carry up to 10 pounds occasionally but could never carry 20 pounds or more. (AR 547). Dr. Hoffman opined that Eskew would probably be absent from work three or four times per month because of flare-ups of her back. (AR 547). Dr. Hoffman stated that Eskew was not a malingerer, and he found that her impairments were reasonably consistent with her symptoms. (AR 547). At the conclusion of the questionnaire, Dr. Hoffman opined that he "would not recommend that she return to any type of gainful employment at this point of time," but noted that "she is still in the early postoperative phase and [he] would hope that she is better six to nine months from now, but that will have to be ascertained at that time." (AR 547).

Dr. Hoffman saw Eskew for a follow-up appointment in May 2012, and he noted that her lower extremity symptoms and strength had improved, but he found that her physical exam results were the same, with a positive straight leg raise test and the same weakness of the extensor hallicus longus on the right side and decreased light touch sensation in the L5 dermatome on both sides. (AR 569, 624).

On July 30, 2012, Eskew underwent a lumbar spine X-ray, which showed stabilization of the grade 1 L4-L5 subluxation, but unchanged disc space narrowing at L4-L5 and L5-S1. (AR 590). The X-ray also showed unchanged lower dorsal and lumbar spondylosis as well as lumbar disc degeneration. (AR 590).

A Baker's cyst was discovered in Eskew's left knee on October 15, 2012, after she had reported to the emergency room for leg pain and swollen knees. (AR 699). Previous ultrasounds and X-rays had not found the cause, but she had been prescribed Lasix to help. (AR 699). Eskew was advised to continue the Lasix and elevate her legs while at rest. (AR 702). On October 25, 2012, despite continued use of Lasix, Eskew reported ongoing pain in her right and left knee. (AR 730). On physical examination, Eskew had quad atrophy, +1 effusion, moderate patella crepitation, and a positive patella femoral grind test in both legs. (AR 731). After ordering and reviewing X-rays of both knees, mild narrowing of the patella femoral joint space was revealed, with medial spurring. (AR 732).

On November 12, 2012, Eskew saw Dr. Hoffman for an appointment, complaining of pain in both legs which began after her surgery. (AR 736). Dr. Hoffman examined Eskew and found the same results, including the positive straight leg raise test, weakness in the extensor hallicus longus, and decreased light touch sensation in the L5 dermatome. (AR 737). Dr. Hoffman advised Eskew against removal of the Baker's cyst, because the cyst would likely recur if excised; instead he recommended a slow return to normal activity. (AR 738).

On January 8, 2013, Eskew presented at Parkview Health for a follow-up visit, seeking medication refills and complaining of back pain. (AR 847). Dr. Mark Dickmeyer examined Eskew and found negative results on a straight leg raise test. (AR 847). Dr. Dickmeyer prescribed tramadol to Eskew for her pain, as well as doxycycline for her acute bronchitis. (AR 847). He also advised Eskew to stop smoking. (AR 847).

Eskew's physical therapist, Troy Hoffer, noted on January 16, 2013, that Eskew's pain

was improved by rest but worsened by movement.  (AR 857).  Hoffer also noted that Eskew had

numbness and swelling in both legs.  (AR 857).  Hoffer stated that Eskew had scored 34 out of

50 on the Oswestry Test, which showed that Eskew "is crippled," and that her "[b]ack pain

impinges on all aspects of [her] life."  (AR 857).

Eskew underwent EMG testing and nerve conduction studies on February 5, 2013, at the

request of Dr. Hoffman, because Eskew had been having numbness and tingling in her upper

extremities for over a year.  (AR 859-65, 871-73).  The results showed that Eskew had severe

bilateral median and ulnar neuropathy.  (AR 868, 873).

When Eskew saw Dr. Hoffman on February 11, 2013, he noted the same positive straight

leg raise test and the same weakness of the extensor hallicus longus on the right side and

decreased light touch sensation in the L5 dermatome on both sides.  (AR 867).

Eskew underwent a cervical spine MRI on February 14, 2013, which revealed "a large

central and left paracentral C5-C6 disc/osteophyte complex which results in direct compression

of the ventral surface of the cervical cord and moderate degenerative central spinal stenosis at

C5-C6."  (AR 876).

On February 15, 2013, Dr. Hoffman saw Eskew for another appointment and

examination, and he again noted the same positive straight leg raise test and the same weakness

of the extensor hallicus longus on the right side and decreased light touch sensation in the L5

dermatome on both sides.  (AR 882).  Dr. Hoffman diagnosed Eskew with cervical degenerative

disc disease, pain, radiculitis, stenosis, and spondylosis after reviewing her MRI results.  (AR

883).  Dr. Hoffman considered a fusion of C5-6, but informed Eskew that cervical surgery would

not alleviate all of her symptoms due to the presence of peripheral nerve entrapment.  (AR 883).

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard.  *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's.  *Id*.  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive.  *Id*.  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision.  *Id*.

### IV.  ANALYSIS

#### *A.  The Law*

Under the Act, a claimant is entitled to DIB if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12

months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether Eskew is disabled as defined by the Act, the ALJ conducted the familiar five-step analytical process, which required her to consider the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[3] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 404.1520. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Id.* at 885-86.

*B. The ALJ's Decision*

On April 5, 2013, the ALJ issued the decision that ultimately became the Commissioner's final decision. (AR 11-25). At step one, the ALJ found that Eskew had not engaged in any

---

[3] Before performing steps four and five, the ALJ must determine the claimant's RFC, or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 404.945(a)(5).

substantial activity since May 15, 2009, the alleged, non-amended onset date. (AR 13). At step two, the ALJ found that Eskew had the following severe impairments: status post lumbar fusion, decompression and discectomy; degenerative joint disease of the knees; carpal tunnel syndrome; major depressive disorder with psychotic features; alcohol dependency; rule out bipolar type 2; mood disorder and psychosis secondary to medical issues; post-traumatic stress disorder; and panic attacks without agoraphobia. (AR 13). At step three, the ALJ found that Eskew did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 14).

Before proceeding to step four, the ALJ determined that Eskew had the following RFC:

> [T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except that the claimant can occasionally balance, stoop, kneel, crouch, crawl and climb ramps and stairs but can never climb ladders, ropes or scaffolds; is limited to frequent handling and fingering bilaterally; must avoid concentrated exposure to wetness and hazards such as wet uneven terrain, heights and machinery; the claimant is able to perform work that does not have stringent production or speed requirements; the claimant must be permitted to stand and stretch every 30 minutes at the work station while remaining on task.

(AR 16).

At step four, the ALJ found that Eskew had past relevant work as a cook, but the ALJ found that Eskew would not be able to perform her past relevant work. (AR 23). The ALJ then concluded at step five that Eskew could perform a significant number of unskilled, sedentary jobs in the economy, including patcher, touch up screener, and charge account clerk. (AR 24). Accordingly, the ALJ determined that Eskew was not disabled from May 15, 2009, the alleged, non-amended onset date, through April 5, 2013, the date of the ALJ's decision; thus Eskew's

claim for DIB was denied.  (AR 89).

### C.  The ALJ's Step Three Finding that Eskew Did Not Meet or Equal a Listing Was Error and Requires Remand

Eskew argues that the ALJ erred at step three, which requires the ALJ to consider whether a claimant's medical findings are equal to a Listing's criteria, because the ALJ did not discuss Listing 1.04, disorders of the spine, at all in the decision, and because Eskew argues that she meets or equals the Listing Criteria for both subsections (A) and (B) of Listing 1.04, even though she only needs to meet or equal one of these subsections to merit a finding of disability at step three.

At step three, the ALJ considered whether Eskew's impairments met or medically equaled a Listing and found that they did not; specifically, the ALJ noted that "[i]n making this finding, the [ALJ] considered the relevant Listings corresponding to the claimant's severe impairments.  Despite the claimant's impairments, the medical evidence does not document listing-level severity, and no acceptable medical source has mentioned findings equivalent in severity to the criteria of any listed impairment, individually or in combination."  (AR 14).  The ALJ then went on to address three mental impairment Listings, specifically Listings 12.04, 12.06, and 12.09, in great detail.  (AR 14-16).  The ALJ did not specifically address Listing 1.04 or any other physical impairment listings.

To meet or equal a listed impairment, the claimant must satisfy all of the criteria of the listed impairment.  *Maggard v. Apfel*, 167 F.3d 376, 379-80 (7th Cir. 1999).  The criteria of Listing 1.04 is as follows:

      1.04   Disorders of the spine (e.g., herniated nucleus pulposus,

spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.  With:

    A.    Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

    or

    B.    Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

    or

    C.    Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. § 404, Subpart P, App'x 1, Listing 1.04.  The claimant bears "the burden of showing that his impairments meet a listing, and he must show that his impairments satisfy all of the various criteria specified in the listing."  *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) (citing *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999)).  The Seventh Circuit Court of Appeals "has also held that an ALJ should mention the specific listings he is considering and his failure to do so, if combined with a 'perfunctory analysis,' may require a remand."  *Id.* (citing

*Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003); *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002)).

The ALJ did not specifically mention Listing 1.04 at step three of the analysis; the Court must thus determine whether this failure to do so was combined with a "perfunctory analysis," such that remand is required. *Id.* The Court agrees with Eskew that the ALJ did not provide sufficient analysis of the step three question. In addition to not mentioning Listing 1.04, the ALJ also did not evaluate any of the evidence on Listing 1.04's required criteria that is favorable to Eskew. Specifically, as Eskew points out, the ALJ did not address evidence of her failed low back syndrome, status post lumbar decompression; huge central disc herniation at L5-S1 with partial cauda equina syndrome; spinal stenosis, recurrent at the L4, L5 and S1 nerve roots; degenerative spondylolisthesis at the L4-L5 and L5-S1 levels; or the scar tissue in the imaging studies.

The particular evidence in the record to which Eskew directs the Court suggests that her impairments may meet Listing 1.04. Eskew's spinal problems remaining after her 2012 surgery—including spondylosis, disc degeneration, and the moderate degenerative spinal stenosis and the large disc/osteophyte complex at C5-C6, which is compressing her spinal cord—seem to satisfy the general criteria of Listing 1.04 that she have a disorder of the spine which has resulted in compromise of a nerve root or the spinal cord. (AR 590, 737, 876).

Additionally, the evidence suggests that Eskew may meet the criteria for Listing 1.04(A) with her lumbar spine condition, as the nearly complete occlusion of the cauda equina and the canal at L5-S1 and the very thin nerve roots at L5 and S1 due to chronic compression, which

were discovered by Dr. Hoffman during the 2012 surgery (AR 634-35), suggest that Eskew has compression of her lumbar nerve root; and because Eskew's limited range of motion in her spine (AR 413), positive straight leg raising tests (AR 569, 576, 624, 737, 867), muscle weakness (385, 546, 569, 576, 624, 641, 737, 882), as well as her L5 radiculopathy (AR 358, 385, 641) and neurogenic bladder (AR 412, 448, 546) suggest that Eskew meets the remaining criteria for Listing 1.04(A).  The evidence also suggests that Eskew may meet the criteria for Listing 1.04(A) with her cervical spine condition, given the large C5-C6 disc/osteophyte complex that is compressing her cervical spinal cord (AR 876), along with the neuropathy confirmed by electromyography and nerve conduction study testing (AR 859, 861, 868, 871-73).

While Eskew has also directed the Court to evidence that she contends shows that she meets the criteria under Listing 1.04(B) for spinal arachnoiditis ("a pain disorder caused by inflammation of a spinal cord membrane, which can lead to the formation of scar tissue" (DE 18 at 12 n.7)), it does not appear that this evidence fully satisfies Listing 1.04(B)'s criteria.  Eskew's MRI results from March 2011 did show a moderate degree of scar tissue at L4-L5 and L5-S1 resulting from her two prior surgeries, and the operative report from her 2012 surgery confirmed the presence of scar tissue.  (AR 335, 635).  However, the portions of the record which Eskew contends document her longtime symptoms of "burning and painful sensation in her legs with sensory loss bilaterally" (DE 18 at 12 (citing AR 412-13, 569, 576, 621, 624, 694-95, 737, 866)), do not seem to satisfy Listing 1.04(B)'s requirement that the spinal arachnoiditis be "manifested by severe burning or painful dysesthesia," 20 C.F.R. § 404, Subpart P, App'x 1, Listing 1.04(B).  These pages, in large part, do not mention burning or painful sensation or sensory loss in her

legs, nor do they mention dysesthesia. Eskew does not even argue that she was ever diagnosed with dysesthesia, but rather only states that she complained of "burning and painful sensation in her legs with sensory loss bilaterally for her entire treatment history." (DE 18 at 12). Furthermore, Eskew does not argue that she had *severe* burning, as required by Listing 1.04(B). The burden to establish evidence of impairments meeting or medically equaling a Listing at step three falls on the claimant; because Eskew has failed to meet that burden with respect to subsection (B) of Listing 1.04, Eskew's arguments here fail. *See Ribaudo*, 458 F.3d at 583. Nevertheless, because Eskew has shown sufficient evidence regarding the requirements of Listing 1.04(A), the ALJ's failure to mention and discuss Listing 1.04 and Eskew's spinal impairments at step three was error and warrants remand.

The Commissioner argues that Eskew has not met all of the criteria for subsection (A), in that she had negative straight leg testing on some occasions and had full muscle strength on the occasions where she did have positive straight leg raise tests. However, as argued by Eskew in her reply, the portions of the record cited by the Commissioner (AR 230, 340, 342, 344, 350, 882) largely do not support the Commissioner's position (AR 882 (documenting a positive straight leg raise test and weakness of 4/5 in the right extensor hallicus longus)) and predate the alleged onset date of May 14, 2011 (AR 230 (dated Sept. 3, 2009), 340 (dated Jan. 20, 2011), 342 (dated Dec. 3, 2010), 344 (dated Sept. 14, 2010), 350 (dated Jan. 23, 2009)). One page cited by the Commissioner does appear to show that Eskew had a negative straight leg test result on January 16, 2013, which was in the relevant time period after the alleged onset date. (AR 847). However, the ALJ did not address this record or any of the records relevant to Eskew's spinal

disorder at step three when considering whether Eskew met or medically equaled a Listing.

The ALJ's step three findings did not provide even a perfunctory analysis of whether Eskew met any Listing with regard to her physical impairments; rather, the ALJ only considered Listings relevant to mental impairments. The ALJ's failure to mention Listing 1.04 or consider the medical evidence in the record supporting a finding that Eskew met this Listing was error and requires remand. *See Ribaudo v. Barnhart*, 458 F.3d at 583 (citations omitted) (holding "that an ALJ should mention the specific listings he is considering and his failure to do so, if combined with a 'perfunctory analysis,' may require a remand").[4]

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order. The Clerk is directed to enter a judgment in favor of Eskew and against the Commissioner.

SO ORDERED.

Entered this 16th day of February 2016.

/s/ Susan Collins
Susan Collins,
United States Magistrate Judge

---

[4] Because the Court finds that remand is warranted due to the ALJ's failure to properly consider whether Eskew met or medically equaled Listing 1.04, the Court need not reach the remainder of Eskew's arguments for remand.